## BOATRIGHT *et al.*, *vs.* HEIRS OF PORTER.

1. A sheriff's deed being offered in evidence, without the production of the execution under which the sale was made, or of any exemplification of the judgment, but it appearing that great diligence had been shown to procure both: *Held*, that the deed was properly admitted in evidence, under the circumstances, upon the faith of its own recitals.

2. In an action of ejectment, evidence of the general bad character of a man who was both feoffee and feoffor in the chain of title of one of the parties, but who was connected with the case in no other way than as his name so appears in the title, is inadmissible.

3. It is not error in the Court, whilst a cause is progressing, to require one party, upon motion of the other, to deliver up, to be used as evidence, papers pertinent to the issue, and admitted to be in his possion and in Court.

4. Under the Act of 1764, entitled "An Act to suppress lotteries, and to prevent other excessive and deceitful gaming," a deed made in consideration of money won by unlawful gaming, vests no title in the grantee, but the title passes at once to the next of kin of the grantor.

5. In an action of ejectment, if the plaintiff rely upon a sheriff's deed, which is junior to a deed from the defendant in execution, put in evidence by the defendant, he must show affirmatively, that the lien of

Boatright *et al.*, *vs.* Heirs of Porter.

the judgment under which the sheriff sold, attached prior to the conveyance of the defendant in execution, under which the opposite party claims.

Ejectment in Dougherty Superior Court.     Tried before Judge ALLEN, at the December Term, 1860.

This was an action of ejectment, instituted on the 17th of May, 1850, in favor of John Doe, on the demises of John S. Porter, Henry J. Porter, Abraham McLaws, and his wife Sarah McLaws, heirs at law of John S. Porter, deceased; James Cartlege, Martin Fields, Benedict White, and Hamlin J. Cook, against Richard Roe, casual ejector, and John Boatright, and Matthew Whitfield, tenants in possession, to recover lot of land number 16, in the second district of originally Early, now Dougherty county.

On the trial of the case in the Court below, the following testimony was adduced, to-wit:

### EVIDENCE FOR THE PLAINTIFFS.

The grant from the State of Georgia to Benedict White, for the land in dispute, dated the 29th of December, 1820.

A deed from Benedict White to Martin Fields, for the land in dispute, dated the 22d of May, 1824, and recorded the 28th of December, 1849.

A deed from Martin Fields to James Cartlege, for the land in dispute, dated the 16th of March, 1826, and recorded the 28th of December, 1849.

A deed from James Cartlege to John S. Porter, dated the 2d of April, 1830, and recorded the 28th of December, 1849, for the land in dispute.

The admissions of counsel for defendants, that the land sued for was situated in the county of Dougherty, and that the tenants sued, as such, were in possession at the time the process was served.

Here the plaintiff rested.

### EVIDENCE FOR THE DEFENDANTS.

A copy deed, duly certified from the records of Early Superior Court, from Benedict White to Edwin Huff, dated 30th

of December, 1820, and recorded in December, 1821, accompanied with an affidavit, accounting for the non-production of the original.

A deed from Edwin Huff to James Anderson, dated 24th of September, 1822, and recorded 21st of October, 1823. Here the defendants closed.

### EVIDENCE FOR THE PLAINTIFFS IN REBUTTAL.

BENEDICT WHITE testified: That he was duly released from liability in this case; that he resided in Columbia county before the war between the United States and Great Britain, and was a soldier in that war; that immediately after the peace, he settled in Baldwin county, and lived there from March until the second Christmas afterwards; that he drew the land in dispute whilst he lived in Baldwin county; that from Baldwin, he moved to Twiggs county, and resided there two years; that from Twiggs, he moved to Wilkinson, and lived there one year; that from Wilkinson, he moved back to Columbia, and while a citizen of Columbia, he got Arthur Foster to take out the grant for him; that Foster sent the grant to him, through the post office at Augusta, and when he took it out and started home, he met with Martin Fields, got into a drinking spree with him, and lost the land in a game of cards with Fields, and made him a deed; that, on the next day, he did not know that he had gambled off his land, until Eldridge, one of the witnesses, told him of it, and he has recollected it ever since; that he never conveyed the land to Edwin Huff, and, if there was ever such a deed, it was a forgery; that he has testified in this case several times—once on the stand, and three times by answers to interrogatories; that he had never sworn that he did not know Huff; that he never swore that he never lived in Twiggs county a day in his life; that A. H. McLaws gave him a note for $300 for his good will, to prevent him from setting aside the deed to Fields, because based on a gaming consideration; that he gave the note to Mullin, to get the money, and had not seen it since; that he never swore that Mullin brought the note back to him, nor that he had delivered the note to McLaws'

brother; that the note had never been paid to him; that witness once thought he would get something from the heirs of Porter, but that it had got so mixed up, that he had given up the idea; that he was ignorant and illiterate, and could neither write or read writing; that he had a conversation with Turpin on the cars, but not about this suit, or the land in dispute, but about land that he was entitled to as a soldier; that he did not know whether the conversation with Turpin was about the land he drew or not, he could not remember; that he did not know whether he told Turpin that he had been down to Albany to attend to a law-suit or not, he did not remember; that he did not know whether he told Turpin that he was interested in the suit or not, and that, if a recovery was had for the plaintiffs, he would get half; he did not remember; that what he said to Turpin was not said under oath.

A deed from Robert Hardy, former sheriff of Baker county, for the land in dispute, dated 4th of March, 1828.

A deed from James Anderson to John Hickman for the land in dispute, dated 13th of December, 1831, which was objected to by defendant's counsel, and objection overruled.

A deed from Hickman to Wells Thompson, dated 8th of October, 1833, and

A deed from Thompson, by John Hickman, his attorney in fact, to Alexander Dennard, both of which were objected to by counsel for defendant, and the objection overruled.

L. G. SUTTON testified: That, in 1834, he knew John Hickman, who was then twenty-five or thirty years old, and his neighbors spoke of him as a contentious man; that rumors were afloat of his being engaged in land swindles in 1838; that he ran away shortly thereafter, and witness understood on account of difficulties about a land transaction; that lands, like the lot in dispute, could have been bought, in 1820, for $30 00, or $40 00 per lot.

### EVIDENCE FOR DEFENDANT IN SUR-REBUTTAL.

NEEDHAM W. COLLIER testified: That some five or six years ago, he saw a note signed by A. H. McLaws, payable

to Benedict White, for $300 00, whenever the heirs of John S. Porter should recover the land in dispute, upon the inter-rogatories of the said Benedict White; that he first was of opinion that White had it, but now thinks it was not White; that the man who had it, and whose name witness does not know, showed it to witness and others, on the 11th of February, 1853, and made inquiry about the status of the land, and the residence of McLaws; that witness called the attention of Pace, Hampton, and others to the circumstance,·and took a memorandum of the note, and what it said, at the time.

PACE testified that Collier's testimony was true.

Col. DAVID A. VASON and the Hon. LOTT WARREN both testified: That on his former examination as a witness, Benedict White swore that he never lived in Twiggs county; that they are certain of this, because they thought that plaintiffs might rely upon a sheriff's deed to Porter, resting on a sale under a *fi. fa.* from a Justice's Court of Twiggs county, and asked the witness the question, in order to ascertain if he ever lived in Twiggs county; that after White had testified on that trial, a motion was made to continue the case, to get the Justice's Court *fi. fa.*, and the motion was not resisted by the witnesses, on the ground that White never had resided in that (Twiggs) county.

WILLIAM H. TURPIN testified: That he had a conversation, at the request of Mr. Sullivan, with Benedict White, on the cars, in which he spoke of a law-suit in Albany, about some land he drew as a soldier, and that they were trying to defraud him out of it; that he lived in Columbia county, and drew the land; that the lawyers were to be paid if the land was recovered, and if no recovery no pay; that T. C. Sullivan heard the conversation, and seemed pleased with White's statements; that he saw nothing in White to make him distrust him, and does not believe he would swear falsely, and would believe him on his oath.

THOMAS C. SULLIVAN testified: That he had made diligent inquiry for Edwin Huff, and learned from his former neighbors, that he had been dead fifteen or sixteen years;

that the facts testified to by Vason, and Warren, and by Turpin are true.

WILLIAM SANFORD testified: That he knew Edwin Huff in 1815, or 1820, or thereabouts, in Baldwin county, but does not recollect the year he left Baldwin county, nor whither he removed; that his character was that of an honorable, correct man, whose integrity witness never heard impeached; that he was an overseer, of moderate means.

WILLIAM R. BUTTS testified: That he knew Edwin Huff well; that he bore the character of an honest man; that he and William Parham were the attesting witnesses to the deed shown to witness, from Edwin Huff to James Anderson, dated 24th of September, 1822; that witness also knew Benjamin Talbert, Thomas Humphries and James C. Humphries, all of whom were men of good standing, and unblemished character; that Talbert and James C. Humphries are dead, and Thomas Humphries is still living; that he has no distinct recollection of Benedict White, although the name is familiar.

THOMAS C. HUMPHRIES testified: That the deed shown him is a copy of one purporting to be by Benedict White to Edwin Huff, both of Baldwin county, dated 30th of December, 1820, and attested by witness and Benjamin Talbert, and James C. Humphries, J. P.; that witness has no recollection of the deed or its execution; he knew White, and Huff, and the witnesses; Huff was a man of good character, so was James C. Humphries, and Benjamin Talbert, and if any one signature to the original of the copy-deed is genuine, the deed is not a forgery.

The depositions of BENEDICT WHITE, taken on three different occasions in this case, and now offered to impeach said White:

In the first, he testified: That he drew the land in dispute whilst he lived in Baldwin county; that he has since resided in Columbia county, and moved from thence to Emanuel county; that he sold the lot to Martin Fields, long before he left Columbia, as the deed annexed to the interrogatories will show, and he never sold it to any one but Fields, as he,

witness, is an honest man; that he sold the land to Fields, on the road from Columbia to Augusta; that the land never did him any good, as he lost the consideration at cards with said Fields; that he never knew Edwin Huff; that he had no interest in the suit, and was a stranger to the parties in interest, except A. H McLaws, and had, therefore, no inducement to do anything but justice between the parties.

In the second, he testified, amongst other things, that he was acquainted with Edwin Huff, of Baldwin county; that McLaws gave him his note for $300 00, not to set up any claim to the land, as he had lost it at cards, and to indemnify him against loss, if he should go to Baker county as a witness; that he gave the note to one Mullin, who went out to Baker county, so that if he saw McLaws, and could get anything, he, Mullin, might have it, but failing to get anything, Mullin returned the note to him, White; that he afterwards gave the note to a brother of McLaws; that the note was not given as a compensation to testify; that the note was to become payable on the contingency of witness having to attend Court, and pay his expenses; that he knows nothing about Edwin Huff's character for honesty, but does not believe him to be just or honorable, or he would not claim the land.

In the third, he testified, that he was acquainted with Edwin Huff.

Col. PETER J. STROZIER testified: That he knew John Hickman in 1838, or 1839, and that he understood that he ran away, and it was also reported that he had some difficulties with Thomas Holmes about land trades; that Hickman, if in life, would now be about 50 years old.

Dr. GILBERT and JOAB GILLIAN testified about the same that Strozier did, as to Hickman's age, if alive, and that they both knew him in 1838 or 1839.

The testimony being closed, the presiding Judge charged the jury:

"That if the jury believed that Benedict White made both deeds, then the deed to Huff, under which defendants claim, being the older, they should find for the defendants.

Boatright *et al.*, *vs.* heirs of Porter.

" The testimony of Benedict White was admitted by the Court, because, on his *voir dire*, he rendered himself competent, but should the jury believe, from the evidence in this case, that he, White, will be entitled to $300 00, or any other sum of money, under the agreement with McLaws, to be paid only in the event that the plaintiffs do recover, then this will show such an interest in him, in this case, as disqualifies him as a witness therein, and the jury should discard his evidence.

" That there are several modes of discrediting witnesses, and amongst them, it is competent to show contradictory statements, made before, and if the jury are satisfied that Benedict White has made statements under oath, upon material facts in this case, contradictory to what he stated on this trial, then the jury should not give his testimony any weight in this case, for the reason, that it is unsafe to trust to the statements of a witness as to any matter, who has testified falsely to any material fact in the case.

" That if the jury should believe that Benedict White never resided in Twiggs county, then no execution could be legally obtained there against him, and the sheriff's sale, under a *fi. fa.* from Twiggs county Justice's Court is void, and no title could pass under such a sale.

"That if the jury should believe this lot of land was won at cards, by Martin Fields, from White, and the deed was made upon that consideration, then no title passed to Fields, by the deed, and plaintiffs cannot recover.

" That if the jury are satisfied that the deed to Martin Fields was made upon a gaming consideration, then the sheriff's sale afterwards, could convey no title from Benedict White to the purchaser, because from the date of the deed in 1824, to Field, he had no interest in the land, for all his title vested in his next of kin—unless the plaintiffs had shown a valid and subsisting judgment against White, anterior to the deed to Fields, and as there is no evidence of the date of the *fi. fa.* against White, under which the land was sold in 1828, the title cannot have effect or relate to any time anterior thereto."

Under this charge, and the facts hereinbefore set forth, the jury returned a verdict in favor of the plaintiffs for the premises in dispute, with costs of suit.

Counsel for defendants then made a motion for a new trial, predicated on the grounds following, that is to say :

1. Because the verdict is contrary to law and evidence.

2. Because the verdict is against the weight of evidence, and without evidence.

3. Because the verdict is contrary to the charge of the Court, and especially so, to the following paragraph of the charge: "that if the jury were satisfied that the deed from White to Fields, in 1824, was based upon a gaming consideration, then no title vested in Fields, but thereby vested in the next of kin of the said White."

4. Because the Court erred in allowing the sheriff's deed, under which the plaintiffs claim title, to go to the jury upon the following testimony of Hamlin J. Cook, to-wit : "that he had applied in Dennard's district, Twiggs county, for the Justice's Court,' *fi. fa.*, under which the land was sold, and after diligent search, was unable to find any docket for the district, or any information as to the *fi. fa.;* that there was now no Justice of the Peace in that district; that he had searched the clerk's office of Baker Superior Court, but found no trace of the *fi. fa.;* that he had not applied to Robert Hardy, the sheriff, who sold the land, for the *fi. fa.;* that he has understood that Hardy lives somewhere in the West; that he did not apply to the Executive Department to ascertain who · was Justice of the Peace in Dennard's district, Twiggs county, at the time, or before, or after the sale; that he did apply to the heirs or administrators of Porter, the plaintiffs in this case, for said *fi. fa.*" The defendants admitted that the *fi. fa.* was not in the possession, power, custody or control of the heirs of Porter, but objected to the deed going in evidence, unless the existence of the *fi. fa.*, recited in it, was proved, which objection the Court overruled, and the deed was admitted, the Court holding that it was not necessary to prove the existence of the *fi. fa.*, and that its

non-production was sufficiently accounted for to let in the deed.

5th. Because the Court erred in admitting the evidence of Strozier and Sutton, as to the general bad character of John Hickman, one of the parties under whom the defendants claimed title.

6th. Because the Court erred in requiring counsel for defendants to deliver up to the plaintiffs' counsel, a deed from James Anderson to John Hickman for the land in dispute, and also a deed from John Hickman to Wells Thompson, and one from Wells Thompson, by his attorney in fact, Alexander Dennard, and in allowing the plaintiffs to introduce them as evidence against defendants, and over their objection, when no notice to produce the deeds had ever been served upon defendant or their counsel.

7th. Because the Court erred in refusing to charge the jury, " that whatever title was in Benedict White, at the time he made the deed to Fields, became vested in his next of kin by said deed," and also, " that as the law stood in 1820, any one could take out a plat and grant by paying the grant fees, and it was not necessary for Huff to have obtained the original plat and grant to White, in order to make his title good."

This motion was overruled, and the new trial refused, and the plaintiffs in error ask a reversal of the judgment, because of alleged error in that decision.

VASON & DAVIS for plaintiffs in error.

STROZIER & SLAUGHTER for defendants in error.

*By the Court.*—JENKINS, J., delivering the opinion.

The jury having rendered a verdict for the plaintiffs in the Court below, defendants moved for a new trial, on several grounds, all of which were overruled by the Court, and to the overruling of each, plaintiffs in error except. I postpone, to the others, the consideration of the 1st, 2d, and 3d grounds.

(1.) There had been a sheriff's sale of this land, under a *fi. fa.*, from a Justice's Court, in the county of Twiggs, (as appeared from a recital in the sheriff's deed), at which defendants in error purchased. Where their deed was offered in evidence, plaintiffs demanded, as preliminary evidence, the production of the *fi. fa.* This was not done, but an attempt was made to shew diligent and ineffectual search for it; and the Court having decided that its absence was sufficiently accounted for, admitted the deed, which ruling was made the fourth ground of the motion for a new trial. It does appear that very considerable and sufficient diligence was used in the search, both for the *fi fa.* and the judgment under which it issued. We know that it is no uncommon thing for the records and files of the Justices' Courts in Georgia to be lost, and in this case the evidence shows, that in the district whence this *fi. fa.* emanated, the Court itself does not now exist. The absence of this *fi. fa.*, and of the judgment, and the want of all evidence as to the date of either, must have very great effect upon the value of this sheriff's deed to the purchaser, whenever it comes in conflict with an older deed, passing title out of the defendants in execution, but upon the question of its admissibility in evidence in this case, we must affirm the judgment of the Court below.

(2.) The fifth ground, is predicated upon the admission by the Court, against the objection of plaintiffs in error, of evidence of the general bad character of Hickman, who was both grantee and grantor in plaintiffs' chain of title. He is connected with the case in no other way than as his name appears in two links of the title. It was not attempted to show that he ever practiced any fraud regarding the title with which he was so connected, but simply to prove that his general character was bad. This is certainly a novel way of attacking title to real estate. How many titles to real estate, in this, and every other country, might be invalidated, if it were legitimate to overthrow them by proof that they had passed through bad men. Very bad men may very honestly acquire, and very honestly transfer, very good titles. This evidence should have been rejected.

Boatright *et al.*, *vs.* heirs of Porter.

(3.) The Court, upon motion of defendants' counsel, requir-ed plaintiffs in error to produce certain deeds, appertaining to the title of the latter to the land in dispute, admitted to be in their possession, and in Court; and in permitting defendants to give them in evidence to the jury, and on this ruling, the sixth ground is predicated. This is held to be erroneous, for the reason that no notice had been given to produce the papers. It is conceded, that had such notice been given, in conformity with the law, the ruling of the Court would have been correct. This position would seem to have been assumed upon the idea, that the power of the Court to require the delivery of the papers, and the right of the opposite party to use them, depended upon the notice to produce them. There is, here, a misconception of the object of the notice, and of the power of the Court. The object of the notice, is simply to compel the party to bring the papers into Court. Being in Court, either with or without notice, the power of the Court over them is precisely the same. It exists independ-ently of the Acts of the Legislature, and the rule of Court relative to notice previously given to produce them in Court, to be used as evidence. We find no error in this.

In the 7th ground, it is assigned as error, that the Court erred, in refusing to charge the jury, " that as the law stood, in 1820, any one could take out a grant by paying grant fees ; and that it was not necessary for Huff (under whom, as the grantee of White, the drawer of the lot in dispute, plaintiff in error claims) to have obtained the original plat and grant to White, in order to make his title good."

We are not prepared to hold that, at any time, any body, a stranger for instance, without the production of authority from the drawer of a lot of land, under our lottery system, could legally take out a grant for the same in the drawer's name. If there be any statute authority for such an act, it has escaped my notice ; none such has been cited. That a practice of this kind may have grown up, is not improbable, but we will not say it was legal. If the Court was requested to charge the jury, that the validity of Huff's title to the land, from White, did not depend either upon the fact that

Huff, *himself*, obtained the grant to White from the State, or, upon the fact, that, contemporaneously with the delivery of White's title to him, he also received the grant which had been issued to White; and refused so to charge, there was error in the refusal.

I am constrained to put this ruling hypothetically, because I do not clearly understand the latter clause of this ground.

(4.) The 1st, 2d, and 3d grounds may be considered together. They aver that the verdict is without evidence, against evidence, against the weight of evidence, contrary to law and to the following charge of the Court, "that if the jury were satisfied, that the deed from White to Fields, (under whom defendants in error claim), in 1824, was based upon a gambling consideration, then no title vested in Fields, but thereby vested in the next of kin of the said White."

This charge was in conformity with the Act of 1764, Cobb's Digest, 725. But, whether the verdict of the jury was contrary to this charge, or contrary to law, depends upon the facts of the case.

To bring the case under this charge, there must have been evidence first, that the deed to Fields *was* based upon a gambling consideration, and secondly that defendants in error had no available title to this land, other than that derived through Fields. We must, therefore, look into plaintiffs' title, as developed in the brief of evidence.

There is no question that the title passed originally from the State to White, by grant. This grant was put in evidence by plaintiffs below, who also deduced title from White, through Fields and Cartledge, to their ancestor, John S. Porter. Their chain of paper title was complete, and they closed with a *prima facie* case made. It must be noted, however, as it will hereafter become important, that the deed from White to Fields, bore date 22d May, 1824. Defendants below then put in evidence a deed from White, (the same person), to one Huff, for the same land, dated 30th December, 1820, which was just one day after the date of the grant to White. Then a deed from Huff to one Anderson, of later date, and there closed, relying upon having shewn title out

Boatright *et al.*, *vs.* heirs of Porter.

of White, anterior to the execution of his deed to Fields.

Plaintiffs below then, in rebuttal, introduced BENEDICT WHITE, the State's grantee, who testified that he had never made a deed for the land in dispute to Huff. That the deed in evidence from him to Huff was a forgery. But he further testified that the deed from himself to Fields, put in evidence by plaintiff, was made in consideration of money won from him at a game of cards, by Fields, when he was in a state of intoxication. It may be well, in this connection, to state, that this witness, (having been made competent by a release), had been examined, by commission and interrogatories, in this case, two or three times previously, and had once before, on a former trial of the same case, been personally sworn and examined as a witness in open Court. His former depositions were read, and witnesses sworn as to his former testimony on the stand, and others, that he had said to them, at different times, things, which, on this occasion, when under examination, he had denied having said to them ; all this for the purpose of impeaching the testimony of White.

Plaintiffs below also put in evidence a deed from Robert Hardy, former sheriff of Baker county, to John S. Porter, (their ancestor), for the land in dispute, dated 4th March, 1828.

In this state of the evidence, if the jury believed the statement of White, that his deed to Fields was founded on a gaming consideration, they found contrary to the charge of the Court, unless they predicated their finding upon the sheriff's deed to Porter. They may have done this, or they may have wholly discredited the testimony of White. If they did discredit White, then the plaintiffs below were left without evidence, to invalidate the deed from White to Huff; for that was impugned by no other evidence. We think the testimony of White should have been put out of view entirely, as being wholly unworthy of credence, because he was self-impeached, and impeached by the testimony of several credible witnesses.

Putting, then, his evidence out of the case for a moment, how stood the parties before the jury—plaintiffs below stood

upon two titles, first, a chain from White through Fields, to their ancestor ; secondly, a sheriff's deed to their ancestor, as purchaser under execution against White. Defendants below showed that White had conveyed this land to Huff, more than three years anterior to the conveyance to Fields, and more than seven years anterior to the date of the sheriff's deed. In the absence of any evidence to invalidate the deed to Huff, it establishes the fact that, at the time of White's conveyance to Fields, the former had no title to the land, and consequently neither the deed from Fields, nor any subsequent one in the same chain, passed any title. The conclusion, therefore, would be that the plaintiffs below failed to deduce title through *this* chain to themselves.

But the deed to Huff was also older than the sheriff's deed, and by this test it would appear, that at the time of the sale by the sheriff, there was no title in White, the defendant in execution, and consequently the sheriff could convey no title to the purchaser.

(5.) But the reply is, that the sheriff's title, by relation, goes back to the time when the lien of the judgment attached. The question then arises, when did that lien attach. Did it attach before the sale to Huff? What is the evidence of it? The execution is not here, the judgment is not here, and in the absence of both, there is no secondary evidence of the date of either. The Court can neither presume that the judgment was in existence anterior to the date of the deed to Huff, nor throw the burthen of proving that it was not upon the plaintiffs in error. This fact is important to the defendants in error, and should have been affirmatively shewn by them on the trial. It may be their misfortune that they cannot prove it, but against that, neither the Court below, nor this Court can relieve them.

In Whatley vs. Newsome, 10th Geo. R., 74, it was held "necessary for a party in ejectment, claiming under a sheriff's deed, to produce the execution, with the sale under it, and the deed made in pursuance thereto, and prove, either title in the defendant, or possession, subsequent to the rendition of the judgment."

If it be suggested that there is still another view of this evidence which the jury may have taken, viz: that they may have believed the testimony of White, disproving the deed from himself to Huff, and invalidating that to Fields, and thus leaving the title in White at the time of the sheriff's sale, whereby the title passed to the ancestor of defendants in error—this is the reply. The evidence of White only so far invalidates the title to Fields, as to prevent its vesting in him and his assigns. Under the state of facts disclosed by him, the Act of 1764 intervened, and vested the title in his next of kin; and here again it became necessary for the defendants in error, to show affirmatively, that the lien of the judgment attached anterior to the vesting of title to the land in White's next of kin, by operation of the statute.

In any and every view we have been enabled to take of this case, our conviction is, that the verdict is contrary to law, and strongly and decidedly against the weight of evidence. Inasmuch as its effect is to dispossess a party in possession, who is presumed to be rightfully so, until the contrary is made to appear, we think the Court below erred in overruling the motion for a new trial, and, therefore, reverse the judgment, and order that a new trial be had.

Judgment reversed.